UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KNAUF INSULATION, GMBH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )    1:12-cv-00273-SEB-TAB |
| | ) |
| SOUTHERN BRANDS, INC., ALBERT A. | ) |
| DOWD, and ROSEMARY M. DOWD, | ) |
| | ) |
| Defendants. | ) |

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS

This cause is before the Court on Defendants' Motion to Dismiss [Docket No. 5],[1]

filed on March 7, 2012, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

For the reasons set forth in the ensuing order, Defendants' motion is DENIED.

### Factual Background

Plaintiff, Knauf Insulation, GmbH ("Knauf"), is an international company with

branches in Europe, Russia, and the United States.   Compl. ¶ 1 ; Defs.' Br. at 2.   Knauf

engages in the business of producing and delivering fiberglass insulation products for

various building and equipment entities.   Defs.' Br. Ex. 2 at 1-2 (promotional material

describing Knauf as a "multinational producer of building materials and construction

---

[1]This docket entry represents only Defendants SBI's and Mr. Dowd's Motion to Dismiss the action.   On March 7, 2012, Defendant Rosemary Dowd filed her own motion [Docket No. 6], requesting to join and adopt the other Defendants' Motion to Dismiss.   The Court will permit Ms. Dowd to join in Defendants' Motion to Dismiss and will hereinafter consider Ms. Dowd among the collective "Defendants" in this entry.

1

systems"). Its dealings in the United States include a fiberglass manufacturing operation headquartered in Shelbyville, Indiana. Compl. ¶ 1.

Defendant Southern Brands, Inc. ("SBI") is a Georgia corporation with its principal place of business in Powder Springs, Georgia. Compl. ¶ 2. The remaining Defendants, Albert and Rosemary Dowd, are a married couple residing in Powder Springs, Georgia. *Id.* ¶ 3. Since SBI's inception in 1983, Mr. Dowd has served as the corporation's Chief Executive Officer. He describes SBI's business model as "focused primarily on sales of batt and blown fiberglass insulation . . . primarily in Florida," but never involving sales to anyone in Indiana. Dowd Decl. ¶ 2. Ms. Dowd is officially listed as SBI's Secretary, but Mr. Dowd alleges that "she has never been actively involved in the management and operations of [its] business." *Id.* ¶ 1. SBI is a very small company; in its highest volume year, it employed only eight full-time staff members. Defs.' Br. at 2.

In the late 1980s, SBI began selling Knauf fiberglass insulation to its Florida customers. The company soon became a distributor of Knauf products in south Florida through an arrangement which was not reduced to writing. Defs.' Br. at 2. Under this informal agreement, SBI purchased insulation from a Knauf territory manager and stocked the product in warehouses for subsequent delivery to SBI's south Florida customers.[2] Defendants allege that SBI assumed several responsibilities under the agreement: the risk of non-payment; millions of dollars of write-offs; and overhead expenses for all

---

[2]In some instances, SBI would arrange for Knauf to ship the product directly to customers. Dowd Decl. ¶ 3.

warehouses, vehicles, and employees. *Id.* at 3. Mr. Dowd specifically avers that "Knauf imposed conditions on SBI's distributor relationship which both increased SBI's costs and reduced its margins . . . all of which squeezed SBI to the point of becoming unprofitable and unsustainable." Dowd Decl. ¶ 6. Indeed, by December 2007, SBI was in Knauf's debt to the tune of approximately $1.8 million dollars. Compl. ¶ 6.

According to Bonnie Cole, a credit analyst for Knauf, SBI began to address its unpaid obligations to Knauf as early as 1991. Cole Aff. ¶ 7. Acting as SBI's agent, Mr. Dowd signed a series of promissory notes in favor of Knauf between 1991 and 2002. *Id.* Exs. A-G (promissory notes signed by Mr. Dowd in 1991, 1992, 1993, 1996, 1999, and 2002). Both of the Dowds also signed a personal guaranty ("the Guaranty") on March 13, 1989 in which they "unconditionally guarantee[d] the full and prompt payment when due, whether by acceleration or otherwise, and at all times thereafter, of all obligations of [SBI] to [Knauf]." *Id.* Ex. H. However, when SBI's past due balance continued to increase in spite of the Guaranty and series of notes, Ms. Cole informed Mr. Dowd that Knauf could no longer finance SBI without security. *Id.* Ex. L (May 13, 2003 letter from Ms. Cole to Mr. Dowd). Representatives from Knauf met with Mr. Dowd in Ohio in June 2003 to discuss the parties' options going forward. Pl.'s Resp. at 4. At this meeting, Ms. Cole alleges, Knauf provided Mr. Dowd with a proposed security agreement, an updated version of the Guaranty, and another promissory note. Cole. Aff. ¶ 13.

On July 22, 2003, Mr. Dowd faxed Ms. Cole a letter asking Knauf to make several changes to the parties' agreement: reduce the amount of the promissory note to

3

$782,846.97; make the promissory note "interest only" through January 2004; set the

payments at $6,000 per month beginning February 2004; and move the promissory note's

balloon date from January 2005 to January 2006.   Cole Aff. ¶ 14; *id.* Ex. M (Mr. Dowd's

letter and Ms. Cole's annotations regarding invoice amounts[3]).   Ms. Cole responded by

letter on July 29, 2003, to which she appended a revised promissory note ("the 2003

Note").   *Id.* Exs. N, O.   The 2003 Note stated, in pertinent part, as follows:

> Southern Brands, Inc. . . . promises to pay to the order of [Knauf] . . . the sum of
> Seven Hundred Ninety Seven Thousand Three Hundred Twenty Seven Dollars and
> One Cent ($797,327.01) . . . . Interest only will be due on the principal . . . until
> January 15, 2004. . . . [I]nstallments shall be in the amount Six Thousand Dollars
> and Zero Cents ($6,000.00) and shall be due on the Fifteenth (15th) day of each
> month beginning on February 15, 2004.   The Twenty Fourth (24th) payment is due
> on January 15, 2006 in the amount of the principal balance on this note.
> . . .
> This note shall be governed by and construed in accordance with the laws of the
> State of Indiana.   Any action to enforce this note may be brought in, and the
> undersigned hereby consents and submits to the jurisdiction of, the courts of the
> State of Indiana.

*Id.* Ex. O.

Mr. Dowd signed the 2003 Note on August 8, 2003 and returned it to Ms. Cole

along with the signed security agreement and the 2003 version of the Guaranty.   Cole Aff.

Exs. O-Q.   The Guaranty, signed by both of the Dowds on July 25, 2003, was to be in

effect "[u]ntil all [l]iabilities guaranteed [there]by [were] paid in full."   *Id.* Ex. Q.   It

concluded with the following provision concerning choice of law and forum:   "This

---

[3]We note that Ms. Cole agreed with nearly all of Mr. Dowd's revisions concerning the
invoice amounts.   She did not reach the same calculation as Mr. Dowd regarding the aggregate
amount of SBI's obligation to Knauf.   However, she did make certain concessions such as
reducing debits and credits and dropping service charges.   *See* Cole Aff. Ex. M.

guaranty shall be governed by and construed in accordance with the laws of the State of Indiana.   Any action to enforce this guaranty may be brought in, and the undersigned hereby consents and submits to the jurisdiction of, the courts of the State of Indiana." *Id.* At some point in the summer of 2006, the 2003 Note, as secured by the Guaranty, was paid in full.  *See* Defs.' Br. at 4 ("paid in full by July[] 2006"); Pl.'s Resp. at 5 ("not paid off until August 8, 2006"); Cole Aff. Ex. S (business record showing SBI's balance due of $0.01 on August 8, 2006).

With mounting financial pressures compounded by the collapse of the housing bubble, SBI's relationship with Knauf was again precarious in 2007.   As before in 2003, SBI and Knauf met (this time, in Shelbyville, Indiana) to discuss solutions to the problem. Defs.' Br. at 4; Pl.'s Resp. at 5; Cole Aff. Ex. T (record of meeting).   Another promissory note ("the 2007 Note") resulted from this meeting; it obligated SBI to pay Knauf $1,876,513.74 and subjected the parties to the same forum selection and choice of law provisions contained in the 2003 Note.   Compl. ¶ 6; *id.* Ex. A.   Mr. Dowd executed and delivered the 2007 Note as SBI's agent on December 7, 2007.   SBI subsequently defaulted on the 2007 Note, and, according to Mr. Dowd, Knauf discontinued delivery of its products to SBI in December 2011.   *Id.* ¶ 7; Dowd Decl. ¶ 12.   This terminated the parties' commercial dealings and "effectively destroyed SBI as an ongoing business."[4]   Dowd Decl. ¶ 12.

The 2007 Note is currently due and payable for the full amount of $1,876,513.74,

---

[4]SBI was administratively dissolved on August 21, 2011.   Compl. ¶ 2.

plus accrued interest.   Compl. ¶ 7.   In addition to the amount due on the 2007 Note, Knauf contends that it is owed $1,625,086.98, plus accrued interest, for goods SBI purchased from Knauf over the course of their business relationship.   *Id.* ¶ 9.   According to Knauf, SBI was aware of its outstanding balance through monthly statements and at no time disputed these statements.   *Id.* ¶¶ 8, 10.   Knauf further alleges that SBI has refused each of Knauf's demands to tender payments for these goods.   *Id.* ¶ 11.   Citing the Dowds' personal obligations under the Guaranty, Knauf also claims that the Dowds must pay Knauf's reasonable attorneys' fees and costs incurred in litigation.   *Id.* ¶ 14.

On February 6, 2012, Knauf filed its Complaint against Defendants in the Shelby County Circuit Court, asserting four causes of action:   (1) a suit on the 2007 Note (Count I); (2) a suit for account stated (Count II); (3) an unjust enrichment claim (Count III); and (4) a suit on the Guaranty (Count IV).   Defendants removed the action to federal court on February 29, 2012 and filed their Motion to Dismiss on March 7, 2012.

## Legal Analysis

### I.  Standard of Review

Federal Rule of Civil Procedure 12(b)(2) requires dismissal of any claim in the absence of personal jurisdiction.   When personal jurisdiction is challenged, the plaintiff bears the burden of demonstrating its existence.   *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003).   The district court may consider affidavits, depositions, and various other documents outside the pleadings in reaching its decision.   *Nelson ex rel. Carson v. Park Indus., Inc.*, 717 F.2d 1120, 1123 (7th

Cir. 1983).   However, the plaintiff "need only make out a *prima facie* case of personal jurisdiction," *Purdue Research Found.*, 338 F.3d at 782, and the court must construe all facts concerning jurisdiction (including disputed facts) in favor of the plaintiff.   *See RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997); *Deluxe Ice Cream Co. v. R.C.H. Tool Corp.*, 726 F.2d 1209, 1215 (7th Cir. 1984).

A federal district court sitting in diversity must undertake a two-step analysis before exercising personal jurisdiction over a non-resident defendant.   First, the court must determine whether its exercise of jurisdiction over the defendant comports with the forum state's long-arm statute.   Assuming the first step is satisfied, the court must then determine whether this exercise is authorized by the Due Process Clause of the Constitution.   *See Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012).   Because Indiana's long-arm statute "reduce[s] analysis of personal jurisdiction to the issue of whether the exercise of personal jurisdiction is consistent with the [f]ederal Due Process Clause," we need only discuss the second step of this preliminary analysis.   *LinkAmerica Corp. v. Albert*, 857 N.E.2d 961, 967 (Ind. 2006); Ind. Trial R. 4.4(a).

Due process subjects a defendant to personal jurisdiction in a particular state only if the defendant has "certain minimum contacts with [that state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"   *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Hous. Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).   A

defendant's "minimum contacts"[5] with the forum state must involve his "purposeful[]
avail[ment] . . . of the privilege of conducting activities within the forum [s]tate, thus
invoking the benefits and protections of its laws."  *Asahi Metal Indus. Co. v. Super. Ct. of
Cal.*, 480 U.S. 102, 109 (1987) (citation omitted).   The requirement of purposeful
availment allows potential defendants to reasonably anticipate conduct for which they may
be haled into court in a foreign jurisdiction.  *Burger King Corp. v. Rudzewicz*, 471 U.S.
462, 472 (1985).

Personal jurisdiction may be either specific or general.   The exercise of specific
jurisdiction over a particular defendant is proper if the cause of action "is related to or
'arises out of' [the] defendant's contacts with the forum . . . [such] that a 'relationship
among the defendant, the forum, and the litigation'" exists.  *Helicopteros Nacionales de
Colom., S.A. v. Hall*, 466 U.S. 408, 414 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186,
204 (1977)).   By contrast, the Constitution places a "considerably more stringent"
restriction on a court's exercise of general jurisdiction.  *Purdue Res. Found.*, 338 F.3d at
787 (citing *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 619 (1st Cir. 2001)).
General jurisdiction over a particular defendant exists only where the defendant has
"continuous and systematic" contacts with the forum state.  *Hyatt Int'l Corp. v. Coco*, 302
F.3d 707, 713 (7th Cir. 2002).   "These contacts must be so extensive to be tantamount to
[the defendant] being constructively present in the state to such a degree that it would be

---

[5]These contacts must result from the defendant's action rather than from the unilateral
action of a third party.  *Purdue Res. Found.*, 338 F.3d at 780.

fundamentally fair to require it to answer in an Indiana court in *any* litigation." *Purdue Res. Found.*, 338 F.3d at 787.   In other words, where such continuous and systematic contacts are present, the court may exercise jurisdiction over the defendant regardless of the subject matter of the lawsuit.   *Hyatt Int'l Corp.*, 302 F.3d at 713.

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of claims for "failure to state a claim upon which relief may be granted."   Fed. R. Civ. P. 12(b)(6).   In order to survive a challenge under this rule, a complaint must have "facial plausibility"—that is, "the plaintiff [must] plead[] factual content that allows the court to draw reasonable inferences that the defendant is liable for the misconduct alleged."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   *Id.*   If a claim has been satisfactorily stated, "it may be supported by showing any set of facts consistent with the allegations in the complaint."   *Twombly v. Bell Atl. Corp.*, 550 U.S. 544, 563 (2007).   Thus, at this stage of the litigation, "the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint."   *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994).   We treat all well-pled factual allegations as true, and we construe all inferences that reasonably may be drawn from those facts in the light most favorable to the non-movant.   *Lee v. City of Chi.*, 330 F.3d 456, 459 (7th Cir. 2003); *Szumny v. Am. Gen. Fin.*, 246 F.3d 1065, 1067 (7th Cir. 2001).

## II.   Discussion

### A.   Personal Jurisdiction

The Supreme Court has unambiguously stated that challenges to personal jurisdiction may be waived by express or implied consent. *Burger King*, 471 U.S. at 472 n.14; *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703-04 (1982). This situation regularly arises in the commercial context, where parties often "stipulate in advance to submit their controversies for resolution within a particular jurisdiction." *Burger King*, 471 U.S. at 472 n.14.   Barring a "strong showing that it should be set aside," a forum selection cause is given controlling weight. *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972).   Indeed, a party challenging a forum selection clause must demonstrate that trying the matter in that jurisdiction "will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court." *Id.* at 18.   Due process is not offended by enforcing a reasonable forum selection clause that has been obtained through a "freely negotiated" agreement. *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1291 (7th Cir. 1989) (citing *Burger King*, 471 U.S. at 472 n.14).   Similarly, Indiana requires a court "to examine whether [a forum selection] clause is freely negotiated and just and reasonable under the circumstances." *Farm Bureau Gen. Ins. Co. v. Sloman*, 871 N.E.2d 324, 329 (Ind. Ct. App. 2007).

Although Defendants dispute the Court's exercise of personal jurisdiction on all four counts of the Complaint, they assert that Knauf's "consent to jurisdiction" argument is germane only to Counts I (Knauf's claim against SBI on the 2007 Note) and IV (Knauf's claim against the Dowds on the Guaranty).   Defendants contend that the forum selection clauses in the 2007 Note and the Guaranty were neither "freely negotiated" nor "just and

reasonable" under the circumstances.   In their view, the economic climate and state of the fiberglass insulation market during the relevant time period created a gross disparity in bargaining power between the parties—one considerable enough to render SBI "Knauf's credit captive."   Defs.' Reply at 3; *see* Defs.' Br. at 3-4.   Because Knauf thrust upon them "offers they could not refuse" without going out of business, Defendants are adamant that they signed the 2007 Note and the Guaranty unwillingly.   Defs.' Br. at 7; Defs.' Reply at 3.   They further allege that the terms of the 2007 Note "were not subject to negotiation or any possible consideration of alternative terms," making the agreement a "take it or leave it deal" that contravenes public policy.   Defs.' Br. at 4, 7.

Pursuant to Indiana law, a flexible, "fact sensitive" analysis must be applied when determining whether a forum selection clause was freely negotiated.   *Sloman*, 871 N.E.2d at 329.   This rule extends to forum selection clauses found in form contracts as long as "there is no evidence of fraud or overreaching such that the agreeing party, for all practical purposes, would be deprived of a day in court."   *Grott v. Jim Barna Log Sys.-Midwest, Inc.*, 794 N.E.2d 1098, 1102 (Ind. Ct. App. 2003) (citing *Mechs. Laundry & Supply, Inc. v. Wilder Oil Co.*, 596 N.E.2d 248, 252 (Ind. Ct. App. 1992)).   Nevertheless, even when a contract appoints a remote forum, the party disputing enforcement of this provision "should bear a heavy burden of proof."   *Id.* (quoting *Carnival Cruise Lines, Inc.*, 499 U.S. 585, 592 (1991)).   The foregoing principles reflect Indiana's presumption that contracts result from freely bargained agreements between parties.   *Trimble v. Ameritech Pub., Inc.*, 700 N.E.2d 1128, 1129 (Ind. 1998).   Therefore, assessing whether a provision or clause

11

has been freely negotiated invokes the doctrine of unconscionability.   A contract is

considered unconscionable if "a great disparity in bargaining power between the parties . .

. leads the weaker party to sign the contract unwillingly or without awareness of its terms."

*Grott*, 794 N.E.2d at 1102.   Merely demonstrating unequal bargaining positions does not

satisfy this "heavy burden."   *See Berry Plastics Corp. v. Protecto Wrap Co.*, No.

3:12-cv-73-RLY-WGH, 2013 WL 772871, at *3 (S.D. Ind. Feb. 28, 2013).   However, the

court's inquiry necessarily examines the parties' relative sophistication and the

circumstances surrounding their agreement.   *Horner v. Tilton*, 650 N.E.2d 759, 763 (Ind.

Ct. App. 1995).

 We are certainly willing to accept as true Defendants' opinion that Knauf was the

stronger partner in the Knauf-SBI business relationship.   The parties' respective size,

revenue, and operational scope alone belie any statement to the contrary.   Even so,

Defendants' argument that Knauf is an "overreaching . . . corporate Goliath" is a step too

far.   Well-settled law establishes that "even a firm with significant market power has no

duty to deal with certain suppliers or distributors."   *Goldwasser v. Ameritech Corp.*, 222

F.3d 390, 398 (7th Cir. 2000).   A manufacturer is generally entitled to choose the

distributors with whom it does business.   *See Sportmart, Inc. v. No Fear, Inc.*, No.

94-C-4890, 1996 WL 296643, at *7 (N.D. Ill. June 3, 1996) (citing *Monsanto Co. v.*

*Spray-Rite Serv. Corp.*, 465 U.S. 752, 760 (1984)).   In fact, under the rule of *United States*

*v. Colgate & Co.*, 250 U.S. 300, 307 (1919), a manufacturer may unilaterally establish the

prices of its goods and "announce in advance the circumstances under which he will refuse

12

to sell." *See also Sportmart, Inc.*, 1996 WL 296643, at *7 ("This 'Colgate right' allows a nonmonopolist manufacturer to unilaterally terminate or refuse to deal with dealers for any reason or for no reason at all."). These principles complement the tenet that Knauf's superior bargaining position, by itself, does not render its arrangement with SBI unconscionable.

Nevertheless, Defendants maintain that they were "presented with documents [they] had no choice but to sign—or go out of business and face suit on the balances claimed due." Defs.' Br. at 7. They argue that because the agreement was drafted by an "overreaching" party and lacked "terms whe[re] the parties might freely choose a forum to address all disputes," the forum selection clauses in the 2007 Note and the Guaranty should not be enforced. *Id.* at 7-8. Based on the evidence before the Court, these claims are unconvincing. For instance, Mr. Dowd does not allege that he or his wife voiced any objection to the forum selection clauses or suggested that Knauf omit them from the documents. Nor does the evidence indicate that either of the Dowds signed the documents either unwillingly or unwittingly—unaware of the forum selection clauses. It is possible, as Defendants assert, that these clauses do not perfectly match Indiana's statutory definition of "conspicuous."[6] However, "[w]hether a term or clause is conspicuous or not is for decision by the court." Ind. Code § 26-1-1-201(10). Two facts support our determination that these clauses *are* conspicuous: first, that neither document exceeds

---

[6]Under Indiana law, a clause is conspicuous "when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals . . . is conspicuous. Language in the body of a form is conspicuous if it is in larger or other contrasting type or color." Ind. Code § 26-1-1-201(10).

13

two pages; and second, that the clauses appear directly above the date and signature line in both documents.   These details, combined with the Dowds' failure to deny that they had an opportunity to read the 2007 Note and Guaranty before executing them, render meritless any claim that the forum selection clauses are inconspicuous.

More importantly, even if we accepted the foregoing allegations as true, we would nonetheless find Defendants' arguments unavailing.   Defendants have not marshaled evidence or case law to support the proposition that their agreement with Knauf involved *undue* influence or *unfair* bargaining power.   *Bonny v. Soc'y of Lloyd's*, 3 F.3d 156, 160 (7th Cir. 1993).   Rather, the record underscores Knauf's efforts to negotiate with SBI throughout the parties' relationship, even when the financial crisis undoubtedly presented Knauf with challenges of its own.   Knauf was extremely patient as Defendants' debt accrued and made several good faith efforts to address this delinquency.   Indeed, Knauf's forbearance is made clear by abundant evidence—namely, that Knauf continued shipping to SBI and its customers through 2011; allowed Defendants to execute new promissory notes despite a long history of default; and, through Ms. Cole, gave Mr. Dowd significant flexibility to negotiate terms in the 2003 Note.   The record also indicates that Mr. Dowd is a reasonably sophisticated businessperson who is no stranger to contract negotiation. Despite his well-founded perception that Knauf had greater bargaining power than he, Mr. Dowd has not pled sufficient facts demonstrating that this power was somehow unfair. Accordingly, having signed the contract, he (and, collectively, Defendants) "is presumed

14

to know its terms and [has] consent[ed] to be bound by them."[7]   *Bonny*, 3 F.3d at 160 n.10.

Here, the forum selection clauses clearly state that disputes between the parties must be litigated in Indiana.   Defendants have not met their burden to rebut the presumption that the 2007 Note and the Guaranty resulted from a freely negotiated deal.   Further, their argument that they were somehow thwarted from contracting with a different fiberglass manufacturer is too tenuous to eviscerate these clauses.   Contracts, as "private, voluntary allocations," are presumed to represent the bargained-for expectations of the parties.   *New Welton Homes v. Eckman*, 830 N.E.2d 32, 35 (Ind. 2005).   With no reason for us to believe anything otherwise about the 2007 Note and the Guaranty, we conclude that the forum selection clauses contained therein are freely negotiated and enforceable.

Defendants' other stated basis for dismissal under Rule 12(b)(2) is that the Complaint lacks facts which might establish general or specific jurisdiction over the Dowds or SBI.   Citing *Burger King*'s "highly realistic" approach to the issue of personal jurisdiction, Defendants argue that Knauf has failed to demonstrate that Defendants purposefully made minimum contacts within the State of Indiana.   Defs.' Br. at 9.   We turn, therefore, to *Burger King* and note that this case involved the Supreme Court's rejection of a mechanical test for determining personal jurisdiction.   In describing the "highly realistic" approach, the Court stated that "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of

---

[7]"Besides that, basic contract law establishes a duty to read the contract; it is no defense to say, 'I did not read what I was signing.'"   *Heller Fin., Inc.*, 883 F.2d at 1292.

dealing . . . must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum."   *Burger King*, 471 U.S. at 479.

A brief comparison of the allegations in the instant case with the facts of *Burger King* indicates that specific jurisdiction over Defendants is proper.   *Burger King* involved a franchise agreement in which the defendant-franchisee, a non-resident, obligated himself to pay over $1 million to the franchisor in a relationship lasting over twenty years.   Here, Defendants agreed to pay nearly $2 million to Knauf in the course of a business relationship also spanning twenty years (late 1980s through the end of 2011).   In *Burger King*, although the defendant did not physically conduct business in the forum state, he "carried on a continuous course of direct communications [with the franchisor] by mail and by telephone."   *Burger King*, 471 U.S. at 481.   The Court accepted these communications as proof of the defendant's purposeful availment of the laws and protections of the forum state, reasoning that:

> Jurisdiction . . . may not be avoided merely because the defendant did not *physically* enter the forum State.   Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. . . . [W]e have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Id.* at 476.

Because the record before us contains copious evidence of the parties' mail, email, and telephone communications, we cannot adopt Defendants' view that their relationship

16

was simply "SBI[] contracting with Knauf to distribute its products elsewhere."   Defs.'
Br. at 9.   Rather, we find the record replete with indications that Defendants created
"continuing obligations" between themselves and residents of Indiana.   *Burger King*, 471
U.S. at 476.   The most obvious example of such obligations is the colloquy between Ms.
Cole and Mr. Dowd regarding the proposed modifications to the 2003 Note.   A string of
emails reminding Mr. Dowd of SBI's staggering debt also evinces an extensive, long-term
association that supports a finding of personal jurisdiction.   And, of course, the fact that
Mr. Dowd met with Knauf representatives in Shelbyville, Indiana[8] to address details of the
2007 Note greatly undermines Defendants' claim that specific jurisdiction is improper.
*Burger King* instructs that "even a single act" can support a finding of specific jurisdiction,
and the instant lawsuit clearly involves multiple acts connecting Defendants to the State of
Indiana.   In sum, we conclude that the parties' relationship is precisely the sort
contemplated by the Supreme Court in *Burger King*—that is, one which sufficiently
establishes personal jurisdiction over a non-resident defendant.   Thus, Defendants'
Motion to Dismiss the Complaint for lack of personal jurisdiction is DENIED as to all
counts.

**B.   Rule 12(b)(6) Motion**

Regardless of the Court's conclusion as to personal jurisdiction, Defendants have
also moved to dismiss Counts II and IV of the Complaint for failure to state a claim upon

---

[8]Mr. Dowd's post-meeting note that he would send Knauf representatives "boxes of Indian River citrus" calls into question his argument that the SBI-Knauf relationship involved "unilateral activity of [Knauf]."   Cole Aff. Ex. U (email from Mr. Dowd to Ms. Cole); Defs.' Br. at 9.

17

which relief may be granted.   Defendants first argue that Count II, Knauf's account stated claim, offers the "threadbare recitals" proscribed by *Twombly* and *Iqbal*.   Defs.' Reply at 10.   This argument is unpersuasive based on Indiana's definition of an account stated claim as one which is "established by an agreement between the parties that all items of the account and the balance of those items are correct, together with a promise, *express or implied*, to pay the balance."   *Auffenberg v. Bd. of Trs. of Columbus Reg'l Hosp.*, 646 N.E.2d 328, 331 (Ind. Ct. App. 1995) (emphasis added).   Because Count II incorporates all allegations preceding it, the claim describes an agreement wherein SBI agreed to pay for goods purchased on its account with Knauf.   *See* Compl. ¶¶ 6-9.   Defendants do not dispute the existence of this agreement, but they suggest that only SBI viewed the account "as a final adjustment of the respective demands between them," which Indiana law requires of both parties.   *MHC Surg. Ctr. Assocs., Inc. v. State Office of Medicaid Pol'y & Planning*, 699 N.E.2d 306, 310 (Ind. Ct. App. 1998).   But Defendants have conveniently glossed over the rule that "[a]n agreement that the balance is correct may be inferred from delivery of [a] statement and the account debtor's failure to object to the amount . . . within a reasonable time."   *Auffenberg*, 646 N.E.2d at 331.   The record indicates that Knauf sent SBI invoices and monthly statements regarding SBI's outstanding debt and, critically, that SBI did not object to these invoices and statements within a reasonable time.   Mr. Dowd's July 2003 letter to Ms. Cole does dispute the outstanding balance, but it is simply "too little, too late."   By this point, he had known for over a year and a half that weekly payments were due, yet he had done nothing to remedy the situation.   *See* Cole Aff. Exs.

18

I-L.   Given the foregoing facts, and remaining mindful that a plaintiff "[need not] plead and prove the creation and performance of each contract underlying the account," we conclude that Knauf has properly pled an actionable account stated claim.   *B.E.I., Inc. v. Newcomer Lumber & Supply Co.*, 745 N.E.2d 233, 236 (Ind. Ct. App. 2001). Accordingly, Defendants' Motion to Dismiss Count II under Rule 12(b)(6) is DENIED.

Defendants' final contention in support of their Motion to Dismiss is that Count IV fails to state a plausible claim for holding the Dowds personally liable under the Guaranty. No more than a sentence comprises Defendants' argument on this point; they assert that the Guaranty "expired on its own terms in July[] 2006, when the 'Liabilities guaranteed hereby [were] paid in full.'"   Defs.' Br. at 10.   Their reply brief contains no additional support for this proposition; it merely revises the Guaranty's alleged expiration date to August 2006.   Defs.' Reply at 10.   Knauf rejoins that Defendants have misinterpreted the Guaranty's definition of the term "liabilities."   Because Indiana entrusts the interpretation of contract provisions to the court, we turn now to the relevant language of the Guaranty. *Heritage Lake Prop. Owners Ass'n v. York*, 859 N.E.2d 763, 765 (Ind. Ct. App. 2007).

The provision invoked by Knauf states, in relevant part, that:

> [T]he undersigned hereby unconditionally guarantees the full and prompt payment when due, whether by acceleration or otherwise, and at all times thereafter, of *all obligations of the DEBTOR to the CREDITOR, howsoever created*, arising or evidenced, whether direct or indirect, absolute or contingent, or now or hereafter existing, or due or to become due (*all such obligations being collectively called the "Liabilities"*) . . . .

Compl. Ex. B at 1 (emphases added).   As we examine the foregoing terms, we must give

effect to the parties' intentions as expressed in the four corners of the Guaranty. *Noble Roman's, Inc. v. Pizza Boxes, Inc.*, 835 N.E.2d 1094, 1098 (Ind. Ct. App. 2005). We must likewise give these terms their plain and ordinary meanings unless they are ambiguous. *Id.* Here, the language used to define "liabilities" is anything but ambiguous; it reflects the Dowd's agreement to vouch for SBI as to *all obligations* of SBI to Knauf, *howsoever created*. The plain meaning of the term "all," when modifying a plural noun like "obligations," is "the whole number or sum of" the noun. WEBSTER'S NEW INT'L DICTIONARY at 54 (3d ed. 1993). As a result, it is obvious that the parties intended the term "liabilities" to include several amounts: the sum due under the 2003 Note, the $1,876,513.74 (plus interest) for outstanding invoices, *and* the $1,625,086.98 (plus interest) for goods purchased. Having paid only the first of these amounts, Defendants cannot now avoid Count IV by claiming to have satisfied "all liabilities." The "end" of a guaranty does not discharge liabilities already incurred; it merely operates to prevent the creation of new liabilities. *See Bandag, Inc. v. Nat'l Acceptance Co.*, 855 F.2d 491, 494 (7th Cir. 1988). Thus, we find that Count IV also properly states a claim upon which relief may be granted, and we DENY Defendants' motion to dismiss this claim.

## Conclusion

For the reasons explicated above, the Court concludes (1) that its exercise of personal jurisdiction over Defendants is proper, and (2) that Plaintiff has properly alleged causes of action for which relief may be granted. Therefore, Plaintiff's Complaint survives this phase of litigation, and Defendants' Motion to Dismiss pursuant to Federal

Rules of Civil Procedure 12(b)(2) and 12(b)(6) is DENIED.

IT IS SO ORDERED.

Date: _____03/19/2013_____

_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

21

Copies to:

ROSEMARY M. DOWD
3435 Mary L. Trail, SW
Powder Springs, GA 30127

Robert E. Rigrish
BODKER RAMSEY ANDREWS WINOGRAD & WILDSTEIN PC
rrigrish@brawwlaw.com

Richard Charles Richmond, III
TAFT STETTINIUS & HOLLISTER LLP
rrichmond@taftlaw.com